**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEREK LEWITTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 07 C 4210 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| ITA SOFTWARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before this court is Plaintiff Derek Lewitton's ("Lewitton" or "Plaintiff") motion for summary judgment [22] on his breach of contract claim against Defendant ITA Software, Inc. ("ITA" or "Defendant"). For the reasons set forth below, Plaintiff's motion [22] is granted.

**I.  Background**

**A.  Local Rules on Summary Judgment**

In ruling on a motion for summary judgment, the Court takes the relevant facts from the parties' respective Local Rule 56.1 ("L.R. 56.1") statements.  The Court resolves all genuine factual ambiguities in Plaintiff's favor (see *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004)), and takes no position on whose version of disputed factual matters is correct.

L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence.  See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000).  The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1.  See*, e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th

Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, e.g., *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). Finally, the Court disregards any additional statements of fact contained in a party's response brief rather than in its statement of additional facts. See, e.g., *Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317).

B. **Pertinent Facts**

The facts pertinent to the Court's consideration of Plaintiff's motion for summary judgment are largely undisputed, at least for present purposes. Defendant ITA is an airline information technology and services provider. Pl. SOF ¶ 7. In April 2005, ITA hired Plaintiff as Vice President of Sales. *Id*. ¶ 9. Immediately prior to his employment with ITA, Plaintiff had worked at United Airlines as Director of Distribution Strategy and Planning. *Id*. ¶ 10. Shortly before Plaintiff began working for ITA, the company announced that it expected to undertake a "general rollout" of a new product called IU, which was expected to offer full service booking and reservations functionality, including e-ticketing, post-ticketing operations such as refund and exchange, integration with mid-office and back-office applications, and an innovative user interface for quick implementation. *Id*. ¶¶ 16-17.

On April 14, 2005, ITA sent a letter to Plaintiff that contained an offer of employment.[1] Pl. SOF ¶ 19; Def. Resp. SOF ¶ 19. Plaintiff executed the employment letter on that same day.

---
[1] The employment letter was attached to Plaintiff's complaint as Ex. B.

*Id*. Among other things, the letter stated that "[ITA] will grant [Lewitton], subject to the approval by the ITA Board of Directors, qualified stock options to purchase up to 200,000 shares of ITA common stock, pursuant to ITA's Stock Option Plan." Pl. SOF ¶ 24. ITA's Board of Directors subsequently approved the stock options grant at $10 per share to Plaintiff as provided in the agreement. *Id*. ¶ 25. The letter also stated that "[t]hese options will vest as follows in equal monthly installments of 5,556 shares each, on the anniversary of your employment for the next three years, except that the first twelve months of options will all vest at your one-year anniversary." *Id*. ¶ 29. The letter further included a clause stating that "up to 150,000 of Lewitton's options will be subject to forfeiture based upon the company's achievement of certain revenue goals as well as your own achievement of performance objectives, as follows: (1) 10,000 options will be retained for each $10 million dollars of ITA's gross revenues for the 12-month period from June 1, 2006 through May 31, 2007 (the 'Assessment Period')." *Id*. ¶ 32. The letter also provided that "in the event the Company's development schedule for 1U is materially deferred from the schedule presently contemplated, the Assessment Period will be deferred accordingly – *i.e.*, if the development schedule were to be delayed by two months, the Assessment Period would be August 1, 2006 through July 31, 2007." *Id*. ¶ 33. Finally, the letter includes the following provision: "This letter is intended to be an integrated agreement and supersedes all prior agreements, understanding or negotiations, written or oral, relating to the subject matter of your employment with ITA (other than any non-disclosure agreements between you and ITA). No amendments or modifications may be made to the terms of this letter except in writing." *Id*. ¶ 35; Def. Resp. SOF ¶ 35.

ITA admitted in its answer to Plaintiff's complaint that "the development of 1U did not proceed in the manner contemplated by Defendant and Plaintiff on April 14, 2005." Pl. SOF ¶

36. ITA also has acknowledged that "the program development that was originally envisioned for 1U was significantly scaled back and eventually only such work as was necessary to preserve ITA's significant investment in 1U continued." *Id*. ¶ 37.

The employment letter provided that either Plaintiff or ITA could terminate Plaintiff's employment "at any time" and that "[a]t the time of any termination * * * all rights to unvested stock options will terminate and the disposition of all vested but unexercised options will be subject to the Stock Option Plan. This means that if termination occurs within the first year, all stock options will be forfeited." Ex. B to Pl. Compl. Plaintiff's employment at ITA ended after 25 months on May 31, 2007. Pl. SOF ¶ 23. During his employment, ITA's Board of Directors took no action to affect the forfeiture of any stock options granted to Plaintiff. *Id*. ¶ 44. On or before August 17, 2007, Plaintiff exercised stock options to the fullest extent permitted by ITA, purchasing 34,722 shares of ITA common stock. *Id*. ¶ 47. The dispute giving rise to this litigation is Plaintiff's assertion that he is entitled to purchase 104,178 additional shares of ITA common stock pursuant to the terms of the employment letter executed on April 14, 2005. *Id*. ¶ 49.

Plaintiff filed a Verified Complaint for Declaratory Relief on July 16, 2007, in the Chancery Division of the Circuit Court of Cook County, Illinois. On July 26, 2007, Defendant removed this action from state court to the Northern District of Illinois. In his complaint, Plaintiff claims that as of the termination date of his employment with ITA, he had vested rights to exercise options to purchase 138,889 shares of ITA common stock at $10 per share,[2] because 5,556 shares vested after each of the 25 months that he was employed by the Defendant. Plaintiff therefore seeks a declaration that he has the right to purchase an additional 104,167

---

[2] The parties do not dispute that the fair value of the stock on the date that Plaintiff's options were approved by the Board was $10 per share. Pl. SOF ¶ 28.

4

shares of ITA stock, which is the number of options that he claims vested under the employment letter, less the 34,722 options that he was permitted to purchase.

## II. Analysis

### A. Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient;

5

there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

B. **Choice-of-law**

Federal courts sitting in diversity must apply the choice-of-law rules of the forum state in which they sit. *Wildey v. Springs*, 47 F.3d 1475, 1480 (7th Cir. 1995); see also *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, (1941).[3] Recognizing the wisdom of the Seventh Circuit's advice that "'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states,'" the Illinois Supreme Court has stressed that "[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Townsend v. Sears Roebuck & Co.*, 227 Ill. 2d 147, 155 (2007) (quoting *Barron v. Ford Motor Co.*, 965 F.2d 195, 197 (7th Cir. 1992)). In this case, the parties appear to agree that the applicable principles of contract interpretation are the same whether the Court applies Illinois law (as Plaintiff suggests) or Delaware law (as ITA suggests).[4] See Def. Br. at 10 n.7 ("Even if this Court applies Illinois law, the same principles of contract interpretation apply"). In the absence of any indication from the parties that "there actually is a difference between the relevant laws of the different states"

---

[3] The employment letter does not contain a specific choice-of-law provision.

[4] ITA's contention that "[a]ny agreement concerning a grant of options to purchase shares of stock in a Delaware corporation is governed by Delaware law" (Def. Br. at 8) overstates the scope of the "internal affairs" doctrine on which its contention is based. See *Beard v. Elster*, 160 A.2d 731, 735 (Del. 1960). As the Fourth Circuit persuasively has held, the internal affairs doctrine requires the application of the law of the state in which the corporation is incorporated where the lawsuit "challeng[es] the corporation's authority to issue stock options to its employees," but does not apply to "a simple contract suit" between the corporation and one of its employees. *Raybuck v. USX, Inc.*, 961 F.2d 484, 487 (4th Cir. 1992). Here, as in *Raybuck*, Plaintiff does not "question[] the power of the defendant corporation to promulgate the [document] under which his options were issued." *Id*. Rather, the dispute is over the attempt by the employee to exercise those options pursuant to the terms of a written agreement – in short, it is "a simple contract suit." *Id*.

6

(*Townsend*, 227 Ill. 2d at 155), this Court applies the substantive law of Illinois, as the law of the forum state.

In any event, it is clear that application of the Illinois choice of law rules would lead to the same result. In choice-of-law disputes involving contracts, Illinois courts have adopted the rules of the Restatement (Second) of Conflicts (1971) and therefore would apply the law of the jurisdiction with the "most significant contacts." See, *e.g.*, *Wildey*, 47 F.3d at 1483. "Contacts to be considered in connection with applying this principle include the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicile, residence, place of incorporation, and business of the parties." *Palmer v. Beverly Enterprises*, 823 F.2d 1105, 1109-10 (7th Cir. 1987) (quoting *Champagnie v. W.E. O'Neil Construction Co.*, 77 Ill. App. 3d 136, 144-46 (1st Dist. 1979)) (following Restatement (Second) Conflict of Laws 188(2) (1971)). The place of contracting is where the last act necessary under the forum's rules of offer and acceptance occurred to give the contract binding effect. Restatement (Second) Conflict of Laws 188, comment e. In Illinois, that place is where the offer was accepted. *Illinois Tool Works v. Sierracin Corp.*, 134 Ill. App. 3d 63, 69 (1st Dist. 1985).

Here, the place of contracting is Illinois, where Plaintiff received, signed, and formally accepted the offer of employment by ITA. The mailbox rule provides that once an offer is made, acceptance is effective when the offeree puts the signed contract in the mail. Restatement (Second) of Contracts § 63 (1979); see *Liquorama, Inc. v. American Nat'l Bank & Trust Co.*, 86 Ill. App. 3d 974, 977 n.1 (1st Dist. 1980) ("According to the 'mailbox rule,' acceptance of a contract is effective when mailed, rather than when received"). Thus, under the mailbox rule, the place of contracting is Illinois because the contract became effective when Plaintiff mailed the contract in Illinois. See *Hinc v. Lime-O- Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). As for the

place of negotiations, the record is unclear as to where the negotiations took place, and indeed whether they took place in only one state or even over the phone with one party in Massachusetts and the other party in Illinois. Regardless of where the majority of the negotiations took place, it is clear that most of the performance of the contract occurred in Illinois. By the terms of the employment letter, Plaintiff was to be based in Chicago, and was to attempt to spend one day per week in ITA's main office in Massachusetts.

Although ITA claims domicile in both Delaware and Massachusetts, that fact does not weigh heavily in its favor since Plaintiff in this case is an Illinois citizen and worked out of an ITA office in Illinois; ITA thus operated for the duration of Plaintiff's employment under the protective blanket of Illinois law. For all the reasons stated above, Illinois has the most significant contacts with this litigation, and its substantive law must be applied.

### C. Contract Interpretation

Under Illinois law, "[c]onstruing the language employed in a contract is a matter of law appropriate for summary judgment * * * unless the contract is ambiguous." *Burris v. Memorial Consultants, Inc.*, 224 Ill. App. 3d 653, 656 (3d Dist. 1992); see also *Avery v. State Farm Mut. Automobile Ins. Co.*, 216 Ill. 2d 100, 129 (2005) ("As a general rule, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law"). In contract interpretation cases, Illinois generally adheres to the "four corners" rule, which provides that "'an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.'" *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (Ill. 1962)); see also *In re Marriage of*

*Best*, 369 Ill. App. 3d 254, 266 (2d Dist. 2006) ("A court's primary goal in the construction of a contract is to decide and give effect to the intent of the parties as it is expressed through the words of the contract").

In applying the "four corners" rule, the Court first looks to the writing itself to determine whether to or not it is intended to be complete and final manifestation of the parties intentions on its face. *Air Safety,* 185 Ill. 2d at 462; see also *Rakowski v. Lucente*, 104 Ill. 2d 317, 323 (1984) (stating that "both the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids"). That approach is consonant with the well settled rule under Illinois contract law that "if the contract imports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parol evidence cannot be admitted to add another item to the agreement." *Sunstream Jet Express, Inc. v. Int'l Air Service Co., Ltd.*, 734 F.2d 1258, 1265 (7th Cir. 1984) (quoting *Pecora v. Szabo*, 94 Ill. App. 3d 57, 63 (1981)). "[U]nder the parol evidence rule, extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict *a fully integrated writing*." *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521 (1st Dist. 2001) (emphasis added). Whether a contract is a fully integrated writing is a question of law. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005).

Here, the analysis is made simple by the incorporation of an integration clause in the employment letter. Specifically, the final paragraph of the document states:

> This letter is intended to be an integrated agreement and supersedes all prior agreements, understandings or negotiations, written or oral, related to the subject matter of your employment with ITA... No amendment or modification may be made to the terms of this letter except in writing.

Compl. at 7, Ex. B. This integration clause makes it clear that any negotiations or understandings leading up to the finalization of the written contract are not to be considered part of the agreement. *Air Safety*, 185 Ill. 2d at 464. An integration clause such as this one is a clear indication that (i) the parties desire that the agreement be interpreted solely according to the language used in the written document itself and (ii) "are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Id*. The employment agreement entered into by Plaintiff and ITA is therefore on its face fully integrated, creating a completed legal obligation between the parties.

However, "even when a contract is integrated on its face, if the contract is ambiguous, as a matter of law, then extrinsic and parol evidence is admissible to explain the terms of the ambiguous contract." *Sunstream*, 734 F.2d at 1266 (quoting *Storybook Homes, Inc. v. Carlson*, 19 Ill. App. 3d 579, 312 (4th Dist. 1974)); see also *Pappas v. Waldron*, 323 Ill. App. 3d 330, 338 (4th Dist. 2001) (citing *Air Safety*, 185 Ill. 2d at 462-63). Correspondingly, "[i]f the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parole evidence." *Air Safety*, 185 Ill. 2d at 462. "Whether language of an agreement is ambiguous and requires additional evidence for interpretation is a question of law." *River's Edge Homeowners' Ass'n v. City of Naperville*, 353 Ill. App. 3d 874, 878 (2d Dist. 2004).[5] Under Illinois law, "[t]he interpretation of the party contending for ambiguity needs to be equally plausible to the construction of the party arguing the contract is unambiguous." *Paul*

---

[5] In *Air Safety*, the Illinois Supreme Court refused to adopt the "provisional admission approach," pursuant to which "although the language of a contract is facially unambiguous, a party may still proffer parol evidence to the trial judge for the purpose of showing that an ambiguity exists which can be found only by looking beyond the clear language of the contract," where (as here), the document at issue "contains an explicit integration clause." 185 Ill. 2d at 463-64. The Court reserved the question of whether "the provisional approach may be applied to interpret a contract which does not contain an integration clause." *Id*. at 464 n.1.

*B. Episcope, Ltd. v. Law Offices of Campbell & DiVincenzo*, 373 Ill. App. 3d 384, 391 (1st Dist. 2007).

Applying those principles, the Court finds no ambiguity in the pertinent provisions of the employment letter, and thus will enforce the plain language of the letter as a matter of law. It is clear that the employment letter created – by ITA's own characterization (ITA Br. at 5) – "a 200,000 option grant, subject to forfeiture." By the terms of the "option grant," Plaintiff's options vested "in equal monthly installments of 5,556 shares each, on the anniversary of your employment for the next three years, except that the first twelve months of options will all vest at your one-year anniversary." Pl. SOF ¶ 29. Under those terms, notwithstanding the accrual of options at the rate of 5,556 each month, Plaintiff would have been entitled to no options if he was terminated during the first year of his employment. However, once Plaintiff reached the one-year anniversary, the first twelve months of accrued options vested, and additional options vested each month until his termination. At the time of his termination, Plaintiff had 138,900 vested, but unexercised, options. *Id.* ¶ 31.

Nothing in the employment letter conditioned the *vesting* on the achievement of any specific performance measures. However, under the plain language of the agreement, "up to 150,000" of Plaintiff's vested options were "subject to forfeiture" on certain conditions: "(1) 10,000 options will be retained for each $10 million dollars of ITA's gross revenues for the 12-month period from June 1, 2006 through May 31, 2007 (the 'Assessment Period')." Pl. SOF ¶ 32. But the letter further provided that "in the event the Company's development schedule for 1U is materially deferred from the schedule presently contemplated, the Assessment Period will be deferred accordingly – *i.e.*, if the development schedule were to be delayed by two months, the Assessment Period would be August 1, 2006 through July 31, 2007." *Id.* ¶ 33.

ITA argues that the agreement is facially ambiguous because the terms "materially deferred" and "development schedule for 1U presently contemplated" are ambiguous. In support of those contentions, ITA notes that those terms are undefined in the letter and that Plaintiff's construction of them would be unreasonable in the context of the agreement as a whole. ITA relies on the affidavit of its CEO[6] and several dictionary definitions to take issue with Plaintiff's contention that a material deferral of the IU development schedule rendered the forfeiture provisions inapplicable as of the time that Plaintiff attempted to exercise his options.

The Court respectfully does not find ITA's arguments persuasive, nor does the Court find ITA's proposed construction anywhere near "equally plausible" to the construction proposed by Plaintiff. See *Paul B. Episcope, Ltd.*, 373 Ill. App. 3d at 391. To begin with, it is well-settled that "a contract term is not ambiguous merely because it is undefined in a contract." *Chapman v. Engel*, 372 Ill. App. 3d 84, 88 (1st Dist. 2007); see also *Winter v. Minnesota Mut. Life Ins. Co.*, 199 F.3d 399, 408 (7th Cir. 1999) ("a term is not ambiguous just because it is not defined"). The absence of any definition of the terms "materially deferred" and "development schedule for 1U presently contemplated" is wholly unsurprising when those terms are viewed in context, as they must be under Illinois law. See, *e.g.*, *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007) ("because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others"); see also *Winter*, 199 F.3d at 408 (in contract interpretation, a court must "give meaning to the words in the context of the contract as a whole").

There is nothing technical or complex about the concept of a material deferral. Thus, it would have been natural for the parties simply to depend on the common, everyday meaning of

---

[6] As noted above, under *Air Safety*, extrinsic evidence may be considered only if the Court finds an ambiguity on the face of the document, which it does not.

those words to control in the event of a dispute. Here, the words "materially deferred" do have a common, everyday meaning. An event is "materially deferred" when it is meaningfully delayed. In other words, a short or *de minimus* delay of a couple of days would not be material under the contract, but a longer delay would be material. That the parties intended the common meaning is even clearer when the phrase is read in the context of the sentence as a whole, which reflects the parties' contemplation of a direct correspondence between the length of the deferral of the development schedule and the extension of the Assessment Period and the parties' use of a two-month period of delay – almost exactly the length of time between Plaintiff's termination on May 31, 2007, and his attempt to exercise his vested options on July 17, 2007 – as an illustrative example of a period of material deferral.

With respect to the phrase "development schedule for 1U presently contemplated," ITA has admitted "that the development of 1U did not proceed in the manner contemplated by Defendant and Plaintiff on April 14, 2005." (Pl. SOF ¶ 36.) ITA also admits that "the program development that was originally envisioned for 1U was significantly scaled back and eventually only such work as was necessary to preserve ITA's significant investment in 1U continued." (*Id.* ¶ 37.) Given those admissions by ITA, any theoretical ambiguity with respect to the precise "development schedule" would be immaterial, because under any plausible definition, the project was scaled back significantly.

The Court also is not persuaded that the dictionary definitions cited by ITA suggest any ambiguity in the parties' use of the term "deferred." As the Seventh Circuit has observed, because dictionaries "collect[] standard usages," but do not "set limits on the scope of language," it often is the case that "[b]oth the linguistic and the functional contexts of words offer better clues to meaning than do dictionaries." *Public Hospital of Town of Salem v. Shalala*, 83 F.3d

175, 177 (7th Cir. 1997). Here, as explained above, those "contexts" reveal both that the parties understood the terms that they used in setting forth their expectations for 1U and that the development of 1U "did not proceed" according to those expectations. In any event, common dictionary definitions of, and synonyms for, "deferred" include "postponed or delayed" (see, *e.g.*, http://dictionary.reference.com/browse/defer (visited Sept. 26, 2008)), and that is precisely what happened here. It is undisputed that as of the time that Plaintiff attempted to exercise his vested options, the development schedule had been delayed by more than a few days and remained "deferred" in the sense that the project had neither been put back on its original schedule nor scrapped altogether.

In sum, the Court finds that the employment letter is a fully integrated, unambiguous document. Accordingly, the Court will construe that the provisions of that document on its four corners as a matter of law, without considering any extrinsic evidence. *Air Safety*, 185 Ill. 2d at 466. As ITA acknowledges, the employment letter is properly viewed as "a 200,000 option grant, subject to forfeiture." ITA Br. at 5. The letter provided for forfeiture in two instances: (i) if Plaintiff was terminated within the first year of his employment or (ii) if certain performance goals were not met as of the end of the Assessment Period. Because Plaintiff was not terminated during his first year with the company, his options vested at the rate of 5,556 options per month until he was terminated. As of his last day with ITA, Plaintiff had accrued 138,900 vested, but unexercised, options. Those options were his to exercise unless forfeited at the end of the Assessment Period. However, because of the material deferral of the development schedule for 1U, the Assessment Period remained open at the time that Plaintiff attempted to exercise his vested options, rendering the forfeiture provision inapplicable. Nothing in the letter permitted the acceleration of the Assessment Period in the event of Plaintiff's termination. Accordingly,

14

Plaintiff had accrued 138,900 vested shares at the time of his termination, none of which were subject to forfeiture under the terms of letter. Because ITA only permitted Plaintiff to exercise his rights as to 34,722 shares of ITA common stock, Plaintiff's is entitled to purchase 104,178 additional shares of ITA common stock.

ITA contends that Plaintiff's proposed construction is "inequitable," "absurd," and results in a "windfall" to Plaintiff. Def. Br. at 13-14. That is by no means clear from this record. Given the absence of any dispute as to the underperformance of the venture, it may be the case that the options have little or no value. Even so, the presence or absence of a windfall is immaterial to the outcome of this case. Courts "are not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck." *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894 (7th Cir. 2004). The Court can only enforce a contract as it is written, not as it is reconstructed after the fact. The governing law is clear, as are the pertinent contract terms. It certainly was plausible to have written a contract that would have tied the granting and vesting of options to the performance of the company, as ITA now contends the parties intended. It likewise would have been possible to have rendered the forfeiture clause enforceable on the date of termination, if that date occurred prior to the end of the Assessment Period. But those kinds of provisions are not present in the contract that the parties negotiated, executed, performed, and agreed in their integration clause would "be interpreted solely according to the language used in the final agreement." *Air Safety*, 185 Ill. 2d at 465. That language is facially unambiguous, and Plaintiff was entitled to rely on the contract as written – particularly where, as here, any material deferral of the development schedule for the product in question was within the control of ITA and its board of directors, not Plaintiff.

### III.   Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment [22] is granted. Plaintiff is therefore entitled to purchase 104,178 additional shares of ITA common stock at a price of $10 per share, in accordance with the terms of the employment letter.

Dated:  September 29, 2008             _____
                                       Robert M. Dow, Jr.
                                       United States District Judge